IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


A.U., by her parents and next friends,      )
N.U. and B.U.,                              )
                                            )
            Petitioner/Appellant,           )
                                            )
v.                                          )        No.  3:06-cv-123/125
                                            )
ROANE COUNTY BOARD OF                       )
EDUCATION,                                  )
                                            )
            Respondent/Appellee.            )


## <u>MEMORANDUM OPINION</u>


These consolidated civil actions, brought pursuant to the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, are before the

court on the plaintiff's motion for judgment on the pleadings and administrative

record [doc. 16] and the defendant's motion for summary judgment [doc. 18].  In

case no. 3:06-cv-123, the plaintiffs (child and parents) appeal the hearing officer's

conclusion that Roane County's proposed placement of the hearing impaired

child in its Head Start collaborative program would provide a free appropriate

public education in the least restrictive environment.  In case no. 3:06-cv-125, the

Roane County Board of Education appeals the hearing officer's conclusion that

Roane County must continue to provide mapping services for the child's cochlear

implants. The parties have responded to the respective motions [docs. 21 and 23], and oral argument on the motions has been heard. Therefore, the motions are ripe for the court's consideration. For the reasons discussed below, the ruling of the hearing officer will be affirmed in part and modified in part.

## I. <u>BACKGROUND</u>

The administrative record in this case has been filed under seal with the court, and the parties have not asked the court to consider any new evidence. *See* 20 U.S.C. § 1415(i)(2)(C) (requiring the court to receive the administrative record and hear additional evidence upon the request of the parties). The following summary of the background of this case is taken from the administrative record.

The child, referred to as A.U. in the pleadings, was born in March 2001 with a profound bilateral sensorineural hearing loss. At fourteen months old, she received a cochlear implant in her right ear and started auditory verbal therapy at the University of Tennessee Child Hearing Services. There is evidence that this cochlear implant is in "soft failure." In June of 2005, she received a cochlear implant in her left ear. Roane County identified A.U. as a "child with a disability" and services were provided under an Individualized Family Service Plan. *See* 20 U.S.C. §§ 1432 and 1436 (requiring early intervention services for infants and toddlers with disabilities, up to age three).

Before the 2004-2005 school year, the parents and Roane County began to consider possible preschool placements, and an individualized education program ("IEP") was developed for A.U.  Roane County proposed placement at the Henry Center, a private day care center in Harriman, Tennessee.  The parents sought placement at Tate's School of Discovery, a private preschool in Knoxville.  A mediated agreement was reached wherein Roane County would pay for A.U.'s placement at Tate's up to the amount it would have paid for her to attend the Henry Center.  Tate's became unavailable for that school year, and A.U. was home-schooled by her mother with five other children.  Roane County continued to provide weekly auditory verbal therapy at the U.T. Center during this time.

In the spring of 2005, the parents and Roane County began to consider an appropriate placement for A.U. in the up-coming 2005-2006 school year.  The parents again sought placement at Tate's, but Roane County's proposed placement was in a new collaborative program being developed in Roane County with Head Start.  There is a dispute whether proper written notice of the change in placement was given prior to the 2005 IEP meetings.  Roane County also proposed to stop paying for mapping services for the new school year, but agreed to pay for the services during the summer.  The parents objected to both the proposed placement and the denial of mapping services, and filed a request for a due process hearing.  Under the "stay-put" provisions of the

IDEA during the pendency of the hearing, 20 U.S.C. § 1415(j), A.U. attended

Tate's during the 2005-2006 school year under the mediated agreement of the

year before.

Following five days of evidence from experts in education, audiology,

and hearing disabilities,[1] the hearing officer found that Roane County's

collaborative program with Head Start met the requirements of the IDEA and

denied reimbursement to the parents for A.U.'s fees at Tate's. The hearing

officer also found that Roane County must continue to provide mapping services

for A.U.'s cochlear implants.

### A. Cochlear Implants

A basic explanation of how cochlear implants work is necessary to

understand the experts' recommendations for A.U. According to the training

materials submitted at the hearing (exh. 13), a cochlear implant is "a surgically

implanted device used by severe to profoundly deaf individuals who receive

minimal benefit from hearing aids." It provides electrical stimulation to the inner

ear rather than acoustical amplification. A microphone detects sounds that are

sent to a speech processor, which uses a mathematical algorithm to digitize and

process speech into a signal that is sent to an external transmitter. The external

transmitter sends the signal across the skin by way of a FM transmission to the

---

[1] The parents appeared *pro se* at the hearing and, in this court's opinion, did an outstanding job presenting their case.

internal receiver-stimulator.  The signal is then sent to electrodes attached to the auditory nerve.  Mapping involves a "series of instructions that are saved into the speech processor to direct it to stimulate the different electrodes at the levels that are appropriate for an individual ear."  The process requires a trained audiologist and specialized equipment.  At the time of the hearing, mapping services for A.U.'s implants were provided by Vanderbilt University in Nashville.

A child like A.U. with cochlear implants has special acoustic needs such as a quiet space with little extraneous noise and reverberation and a close distance to the person speaking.  The American National Standards Institute ("ANSI") standards recommend that a normal classroom have a 15 decibel "signal to noise" ratio.  This number is determined by comparing the noise level in the classroom with the signal – usually the voice of the teacher.  Assuming a noise level of 35 decibels (the ANSI recommendation for an empty classroom), the teacher would have to speak at 50 decibels to achieve the desired 15 decibel difference.  In A.U.'s case, the evidence showed that she needs a 20-30 decibel signal to noise ratio because of her cochlear implants.  A personal FM transmitter worn by the teacher would  increase the signal to noise ratio about 20 decibels for the child with cochlear implants but does not affect others who do not have an FM receiver, although A.U. was too young to use a personal transmitter.  Also, a sound field FM system (speakers in the classroom) can improve the signal to noise ratio for a cochlear implant child by 10 to 12 decibels.

Following a cochlear implant, there is a critical window of opportunity for the child to learn to hear and speak. A.U. began auditory verbal therapy[2] shortly after receiving her first cochlear implant. This type of therapy consists of the child spending a couple of hours a week with a trained therapist, the parents and teacher being trained to reinforce what the therapist does, and the child spending as much time as possible with typically developing peers to develop age-appropriate language and speech skills. Of course, mapping of the device is critical.

B. Expert's Recommendations

The parties in this case presented the testimony of several experts in audiology, speech therapy, and education. The hearing officer accurately set out these experts' testimony, so only a brief summary will be necessary here. A.U.'s treating audiologists and therapists, Andrea Hedley-Williams (pediatric cochlear implant audiologist), Gayla Hutsell (certified auditory verbal therapist), Velvet Buehler (audiologist and speech pathologist), and Lynn Harmon (speech language pathologist),[3] all testified that it was critical for A.U., given her age and developing language skills, to be in a classroom with typically developing peers

---

[2] There are other types of therapies for hearing impaired children, but evidently auditory verbal therapy is recommended for children with new cochlear implants and it is the therapy the parents chose for A.U. Roane County has been paying for auditory verbal therapy at the University of Tennessee.

[3] Lynn Harmon was retained by the parents to observe the various classrooms and make recommendations. The parents argue in their motion that the hearing officer did not adequately consider Ms. Harmon's testimony. Ms. Harmon's conclusions about the proper placement for A.U. were consistent with the other experts who testified on behalf of the parents.

for language and speech. But, A.U. should not be the highest functioning child because she needs to be around children with better skills as models. They also stressed that noise would interfere with A.U.'s ability to hear, as would distance from the speaker. The teacher from Tate's testified about her classroom and A.U.'s participation in the classroom since the beginning of the 2005 school year.

Roane County's experts included Aimee Mason (Roane County speech/language pathologist), Leigh Lamb (Roane County education audiologist), Ellen O'Callaghan Sheldon (regional Head Start director), Stephanie Walker (Roane County special education supervisor), and the teachers from the Roane County collaborative program and the Henry Center. They testified that the Roane County Head Start program had typically developing children, that the classroom was appropriate, and that the teaching staff was trained to work with A.U.'s special needs.

## C.  Available Classrooms

### 1.  *Roane County's Collaborative Head Start Classroom*

Prior to the 2005-2006 school year, it is undisputed that Roane County did not have a public preschool program suitable for A.U., thus the suggested placement at the Henry Center. However, in the spring of 2005, Roane County began to plan for a collaborative program with Head Start. As the program was described to the parents during the spring meetings, it would be mostly Head Start children, eligible for the program based on socioeconomic

reasons, but characterized as typically developing.[4]  Some disabled children

eligible for preschool services under the IDEA would also be in the classroom.  At

that time, no teachers had been hired, and it was not clear what the classroom

would be like.

In the summer, a regional Head Start director was hired, classroom

teachers were identified, and classrooms at the Midtown Education Center were

prepared.  One classroom in particular was prepared in anticipation that A.U.

would be in the group of children using that space.[5]  Efforts were made to reduce

noise and reverberation using rugs and wall hangings, and the room was divided

into small learning centers.  An experienced preschool teacher was hired as well

as a trained aide and an assistant with many years' experience with preschool

children.  A speech pathologist is located at Midtown, and the lead teacher has

been trained to work with a child with cochlear implants.

Several persons, including A.U.'s mother, testified at the hearing that

they had visited the Midtown classroom in late August-early September 2005.

There were about ten or eleven children in the classroom who were three and

four years old.  About 50% of the children appeared to be typically developing,

---

[4] A "typically developing" child is one that has not been identified as having a handicapping condition.

[5] After the sound levels of the proposed classrooms were measured, a second, slightly smaller classroom at Midtown was identified as being a better classroom for A.U. as far as noise was concerned. It was proposed that the teachers and children from the first classroom would move into the second classroom, so the only change would be a better physical space.

while other children had disabilities, but not necessarily hearing loss.  All three adults worked with the children, sometimes at learning centers in small groups.  The abilities of each child in the program are assessed and each child is given individualized instruction as needed.  Some experts who observed the Midtown classroom believed the level of instruction was lower than what they observed at Tate's.  Some of the children appeared to have skills similar to A.U.'s, but others' skills were not as advanced.

The classroom itself was a large room, with several different learning areas defined by rugs on the floor.  Fabric and other materials were used on the walls to reduce the area of hard surfaces.  In the fall of 2005 after the school year began, a better acoustical ceiling and a sound field FM system were installed in the classroom, and tennis balls were put on the legs of the chairs to reduce noise.

At the suggestion of the hearing officer, the room was measured for noise levels by two audiologists.[6]  Both experts measured the noise level of the room while it was unoccupied.  The average noise level for the empty room was about 42 decibels.[7]  There was a HVAC unit on the roof of the classroom which both experts believed contributed significantly to the noise levels.

_____

[6] The experts' actual measurements are found in hearing exhibits 44, 48, and 49.  The measurements were not significantly different and for purposes of this discussion the court will use average measurements.

[7] The court is using the measurements made after the ceiling tiles had been replaced and work had been done on the HVAC unit had been done.  The noise levels were slightly lower after the modifications had been made.

### 2. *Tate's School of Discovery Classroom*

The classroom at Tate's is smaller than the Roane County classroom. It has a carpeted floor and learning centers. There is one experienced preschool teacher who was trained to help A.U. with her cochlear implants. There are ten to eleven children in the classroom, all of whom are four years old except one five year old. Most of the witnesses who visited the classrooms while children were present believed the level of learning to be higher than what they observed at the Roane County Head Start classroom.

The empty classroom at Tate's was also measured for noise levels. It was measured at 35 to 37 decibels. The sources of intermittent noise were a copy machine, plumbing, footsteps, and children playing outside.

### 3. *Henry Center Classroom*

The hearing officer did not consider the appropriateness of the Henry Center as a placement, in spite of the fact that Roane County believed it to be an option for A.U. as shown by the evidence it produced at the hearing, its post-hearing brief, and its motion before this court. The parents argued that the Henry Center was not mentioned in the IEP and they did not receive any notice that Roane County believed the Henry Center to be a proper placement, so the Henry Center should be excluded from consideration. Roane County says that the Henry Center was never "taken off the table"; that it was always an option for A.U. as evidenced by the mediation agreement.

Even so, a brief discussion of the Henry Center will be included for the sake of completeness. The Henry Center is primarily a day care center for preschool children. There is an educational emphasis for children who stay all day. All but one of the children in the three to four year old class are typically developing. There are two adults for up to eighteen children, and there is a speech pathologist on site. The Henry Center is not an accredited school. If needed, a teacher would be trained to provide services for a hearing-impaired child.

Only one of the audiologists measured the noise levels in the unoccupied Henry Center classroom. It had the lowest noise level at 31-32 decibels. Noises outside the classroom contributing to the noise level were traffic, voices in the hallway, and trains.

## II. LEGAL DISCUSSION

The IDEA provides that a party aggrieved by the findings and decision of the administrative law judge has a right to bring a civil action in federal court. 20 U.S.C. § 1415(i)(2). The court shall receive the record of the administrative proceedings, hear additional evidence if the parties make such a request, and, basing its decision on the preponderance of the evidence, grant appropriate relief. *Id.* The court is required to make findings of fact based on the preponderance of the evidence contained in the complete record, while giving

due weight to the fact findings of the administrative proceedings. *See Knable v. Bexley Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). The Supreme Court has warned that the "'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *see also Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).

The court has a two-part inquiry: (1) whether the school system complied with the procedures set forth in the IDEA, and (2) whether the individualized program developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207. The parents raise one procedural issue concerning written notice of a placement change for A.U., and they also contend that Roane County's recommended placement was not the least restrictive environment for A.U. Roane County argues that the hearing officer erred in concluding that it must continue to provide mapping services for A.U.'s cochlear implants.

A. Failure to Provide Written Notice

The parents argue that they did not receive the required written notice of Roane County's intent to initiate a change in the educational placement

for A.U.  *See* 20 U.S.C. § 1415(b)(3).  The parents were advised for the first time at the April 2005 meeting that Roane County was developing the Head Start collaborative program and it would recommend that A.U. be placed there for the 2005-2006 school year.  The April meeting was continued to May, and the subject of A.U.'s placement was again discussed.  The parents stayed in contact with the Roane County IEP team members throughout the summer, and the mother visited the Head Start classroom in August.

The court finds that any procedural violation in this case was harmless.  *See Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625 (6th Cir. 1990).  Even if there was a lack of written notice, it did not result in a loss of educational opportunities for A.U., nor did it prevent the parents from participating in the process.

## B.  The Appropriate Placement for A.U. for the 2005-2006 School Year

The goal of the IDEA is that every disabled child receive a free appropriate public education ("FAPE").  20 U.S.C. § 1400(d).  The obligation to provide a FAPE begins for an eligible child at her third birthday.  20 U.S.C. § 1412(a)(1)(A).  Once a preschool child like A.U. has been identified as having a disability, the school system must develop an IEP that includes a description of how the disability affects the child's participation in appropriate activities; a statement of measurable annual goals; a statement of the special education and

related services that will be provided; an explanation of the extent, if any, that the child will not participate with non-disabled children in a regular class and activities; a statement of modifications of state and district wide assessments; the projected date for the beginning of the services; and a statement of how the child's progress will be measured and how the child's parents will be kept informed. 20 U.S.C. § 1414(d)(1)(A). For a child who is deaf, the IEP team should specifically consider the communication needs, the opportunities for direct communications with peers, and the professional personnel needed to help the child with language and communication. 20 U.S.C. § 1414(d)(3)(B)(iv).

The IDEA provides that children with disabilities, to the maximum extent appropriate, should be

> educated with children who are not disabled, and that special classes, separate schooling, or other removal of disabled children from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This provision, known as "mainstreaming," requires that a child be educated in the least restrictive environment ("LRE"). *Id.*; *see also* 34 C.F.R. §§ 300.550-.556.

However, public school systems that do not operate programs for non-disabled preschool children are not required to initiate programs to satisfy the requirements of an LRE placement. *See Bd. of Educ. of LaGrange Sch. Dist. No.*

14

*105 v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915 (7th Cir. 1999).  There are alternative methods of meeting the requirements such as participation in public preschool programs such as Head Start or placement in private preschool programs for non-disabled children.[8]  *Id.* at 916.

The school system is not required to "maximize each child's potential commensurate with the opportunity provided other children" (*Rowley*, 438 U.S. at 198), but must "confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue."  *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004), *cert. denied*, 126 S. Ct. 422 (2005).  "An 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child."  *Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 505 (6th Cir. 1998).  "[A] court's review 'must focus primarily on the District's proposed placement, not on the alternative that the family preferred.' The proposed placement must be upheld 'if it was reasonably calculated to provide [the disabled child] with educational benefits.'"  *Id.* (quoting *Rowley*, 458 U.S. at 207).

In this case, there is no dispute that a proper IEP was developed for A.U. for the 2005-2006 school year.  The only issue is the location where the goals of the IEP will be implemented.  Roane County argues that the LRE where

---

[8] In this case, for the school year 2004-2005, Roane County recommended placement in the Henry Center since it did not operate a program for non-disabled preschool children.

15

the child could have received a "meaningful educational benefit" was the Head Start collaborative classroom at Midtown. Or, in the alternative, Roane County argues that the Henry Center also met the criteria. The parents, on the other hand, argue that Tate's was the only classroom where A.U. would be surrounded by 100% typically developing children, many of whom had better language and speech skills than A.U.

As set out above, the issue is whether the classrooms Roane County proposed for A.U. were appropriate, not whether Tate's was the best option for A.U. The court first will consider the physical aspects of the proposed classrooms. The unoccupied classroom at the Henry Center had the lowest noise levels of any of the proposed classrooms, which were below the ANSI guidelines. The Tate's classroom was next, followed by Midtown Classrooms #2 and #1. The court finds, however, that the noise level measurements of the unoccupied classrooms are of little value beyond establishing a base decibel level. A.U. would be in a classroom with other children and teachers all of whom would be generating noise. Thus, using the measurements taken, there is no way to determine whether the signal to noise ratio would be adequate for A.U. in any of the classrooms. The reverberation times for all the classrooms met the ANSI guidelines.

A sound field amplification system was installed in the Roane County Classroom #2 in early November 2005. The testimony was that such a system

would improve the signal to noise level for A.U. by 10 to 12 decibels. Assuming that the amount of noise generated by the children and teachers in all the classrooms is essentially the same, the sound field system would compensate for any differences in the slightly higher noise level of the empty classroom at Midtown.

Next, and most importantly according to the experts, A.U.'s auditory verbal therapy required that she be in a classroom with typically developing children. There is no dispute that the children at Tate's were all typically developing, some with better language and speech skills than A.U. The Midtown classroom had about 50% typically developing children. And, the testimony was that at least one of the children with a disability did not have language and speech deficits. All but one of the children attending the Henry Center during the 2005-2006 school year were typically developing. Further, both Midtown and the Henry Center had a speech pathologist on site. The teachers at Tate's and Midtown were trained to serve children with cochlear implants, and the evidence was that the Henry Center teacher could have been trained also.

The hearing officer found that Roane County presented credible expert testimony that A.U. could receive educational benefit in the Midtown classroom, notwithstanding the fact that the Head Start program at Midtown was not made up of 100% typically developing children. The hearing officer found, and this court agrees, that Roane County was not required to provide such a

program.  Giving due weight to the hearing officer's conclusions, this court affirms the hearing officer's finding that Roane County's program would have provided a FAPE for A.U. in the least restrictive environment.  The court finds that even if the Midtown classroom was not the least restrictive environment because of the number of disabled children in the class, the Henry Center clearly met the least restrictive environment requirement and would have provided a FAPE for A.U. Thus, the parent's decision to reject Roane County's proposed placement for A.U. for the 2005-2006 school year was not supported by the evidence.

There is one remaining issue raised by the parents.  They argue that the FAPE was not made available in a timely manner, so they were justified in insisting that A.U. attend Tate's.  *See* 20 U.S.C. § 1412(a)(10)C)(ii).  At the time A.U.'s IEP was being developed, there was no defined Head Start collaborative program.  The court understands the parents' reluctance to embrace the Head Start collaborative program in the spring of 2005 because it did not even exist at that time.  However, by the time the school year started, the program was up and running so the parents had sufficient time to investigate the proposed placement at Midtown and make a decision before rejecting the placement.  The court finds that the classroom and teaching staff in the Midtown classroom at the time the school year began would have provided A.U. with a FAPE, and the later improvements made an adequate classroom even better.

C.  Mapping of A.U.'s Cochlear Implants

Under the IDEA, a disabled child's IEP must include a statement of the related services that the school system will provide for the child. 20 U.S.C. § 1414(d). There is no dispute between the parties that prior to the 2004 amendments to the IDEA, Roane County considered mapping of a child's cochlear implant a related service. Roane County paid for the mapping of A.U.'s cochlear implants until the beginning of the 2005 school year but, based on the amendments, declined to further pay for the service.

The definition of "related services" was amended in 2004 to exclude "a medical device that is surgically implanted, or the replacement of such device" from the types of services a school system must provide.[9] 20 U.S.C. § 1401(26)(B). The hearing officer concluded that it was not clear that the amendment eliminated mapping of cochlear implants as a related service, and granted the parent's request that Roane County continue to pay for the mapping services. Roane County argues in this court that the 2004 amendments apply to this case, and the amendment excludes mapping of cochlear implants as a related service. In response, the parents argue that the amendment is ambiguous and does not specifically exclude mapping. Furthermore, the subsequent regulations which target mapping of cochlear implants as an

---

[9] The definition of "assistive technology device" was similarly amended to add the same language. *See* 20 U.S.C. § 1401(1).

excludable service were not effective until October 13, 2006, so the hearing officer's conclusion should be affirmed up to that date.

The parents submitted a copy of a letter from the sponsor of the senate bill, Senator Judd Gregg of New Hampshire, to the Secretary of Education that points out that an earlier version of the 2004 amendments to the IDEA specifically excluded programming (mapping) of surgically implanted medical devices like cochlear implants.  Exh. A to doc. 21.  However, Senator Gregg states the exclusion was modified in the final draft of the bill as set out above. Senator Gregg was concerned that the Secretary's draft regulations would eliminate the programming services from the definition of related services. Notwithstanding his concerns, however, the federal regulations implementing the 2004 amendments, effective October 13, 2006, now state, in relevant part, that "services that apply to children with surgically implanted devices, including cochlear implants" are excepted from the definition of related services.  34 C.F.R. § 300.34(b) (2006).  Specifically, "[r]elated services do not include a medical device that is surgically implanted, *the optimization of that device's functioning (e.g., mapping)*, maintenance of that device, or the replacement of that device." 34 C.F.R. § 300.34(b)(1) (2006) (emphasis added).  The exception does not apply to routine checking of an external component to make sure it is functioning properly.  34 C.F.R. § 300.34(b)(2)(iii) (2006).

The hearing officer found, and in its brief Roane County concedes, that the amendment is "somewhat ambiguous." The court agrees. The amendment to the definition of related services is anything but clear. Therefore, given the statute's ambiguity and the lack of any implementing regulations to the contrary, the hearing officer's conclusion that Roane County should continue to pay for A.U.'s mapping services was reasonable.

However, where a statute is "ambiguous with respect to a specific issue, the 'interpretation put on the statute by the agency charged with administering it is entitled to deference.'" *See Mich. United Conservation Clubs v. Lujan*, 949 F.2d 202, 206 (6th Cir. 1991) (quoting *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31-32 (1981)). The court finds that the new regulations have changed the playing field. Effective October 13, 2006, the regulations make it clear that programming of cochlear implants is not a service that a school system must provide.

There is a general presumption that absent specific language to the contrary, new legislation or regulations are not retroactive. *See BellSouth Telecomm., Inc. v. Southeast Tel., Inc.*, 462 F.3d 650, 661 (6th Cir. 2006). But, this presumption does not apply to prospective relief. *Id.* (finding that the propriety of applying new regulations that affect prospective relief does not raise retroactivity concerns); *see also Tucker*, 136 F.3d at 501 (finding that IDEA amendments only have prospective application).

21

In this case, giving the agency's interpretation of the "related services" the deference it is due, the court finds that Roane County is not responsible for mapping of A.U.'s cochlear implants after October 13, 2006. The hearing officer's conclusion is modified to this extent.

## D. Attorney's Fees

Both parties have asked for attorney's fees as part of the relief requested. *See* 20 U.S.C. § 1415(i)(3)(B). Based on the above discussion, Roane County prevailed on all issues except the issue of Roane County paying for mapping services from September 2005 to October 13, 2006. Therefore, the parties shall file briefs and specific requests for attorney's fees within thirty days of the entry of this Memorandum Opinion.

## III. **CONCLUSION**

For the reasons discussed above, the parents' motion for judgment on the pleadings will be denied, and Roane County's motion for summary judgment will be granted in part and denied in part. An order reflecting this opinion will be entered.

ENTER:

_____*s/ Leon Jordan*_____
United States District Judge